# Supreme Court of Florida

_____

No. SC2022-1176
_____

**WILLIAM F. ROBERTS,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

June 25, 2026

PER CURIAM.

William Roberts appeals his conviction of first-degree murder and sentence of death.  We have jurisdiction.  *See* art. V, § 3(b)(1), Fla. Const.  For the reasons explained below, we affirm.

## I

In the late evening of December 18, 2017, Roberts sent a text message to a friend, Glen Reynolds, indicating he had an argument with his then-girlfriend, Elizabeth Hellstrom.  Roberts suggested she had become unresponsive, but he was able to "bring her back." Reynolds noticed the text messages at 3:00 a.m. but could not get in contact with Roberts.  They connected later that day and

Reynolds learned that Roberts had found thirty Klonopin pills missing. When they spoke again later that afternoon, Roberts revealed that Elizabeth was dead and had been placed in the trunk of her car. Roberts also indicated he had a propane tank in the car, which he planned to use to commit suicide. Reynolds reported the matter to the Lake County Sheriff's Office, which issued a be on the lookout for Roberts, Elizabeth, and Elizabeth's Toyota Camry.

Eventually, the Lake County Sheriff's Office located the camper shared by Roberts and Elizabeth, and later, Elizabeth's vehicle. During the well-check conducted in the camper, officers noticed signs of blood in the sleeping area and that bedding had been stripped.[1] After locating Elizabeth's vehicle, deputies found her naked body in the trunk wrapped in a white mattress pad and covered by a blue tarp. In addition, crime scene investigators found

---

1. When Lake County deputies executed the search warrant for the camper, they found Elizabeth's purse with identification information and two cylindrical type objects near the door. Other items found in the search included a box of butterfly bandages, an empty wrapper originally containing a butterfly bandage, and a security camera. Blood was located on three walls of the sleeping area of the camper. The two cylindrical objects found at the entrance to the camper were tested. Roberts' DNA was found on one end of one of the objects and Elizabeth's DNA was located on both ends of the same object.

items including a shovel, a pickaxe, a propane tank, a yellow hose, and a regulator valve to a propane tank. A butterfly bandage was located on Elizabeth's nose.

On February 5, 2018, Roberts was indicted for first-degree murder. Three days later, the State filed a Notice of Intent to Seek Death Penalty listing two statutory aggravators under section 921.141(6), Florida Statutes (2018): (1) that Roberts was previously convicted of another capital felony, or of a felony involving the use or threat of violence to the person, and (2) that the capital felony at issue in the current case was especially heinous, atrocious, or cruel.

The trial court appointed Candace Hawthorne to represent Roberts. Roberts initially waived his right to appear at jury selection but appeared in the courtroom after a break. He complained that he was unhappy with Hawthorne as his counsel. He also expressed his desire to have a bench trial to speed up the trial process. He presented the court with a signed waiver of his right to a jury trial and a signed waiver of his presence. The trial court conducted a lengthy colloquy with Roberts and determined that both of his waivers were knowing and voluntary.

The case proceeded as a bench trial, and the trial court returned its verdict of guilty of first-degree premeditated murder. At the outset of the penalty phase, Roberts instructed his counsel not to present any mitigating evidence. The trial court conducted a hearing and determined that Roberts had knowingly, intelligently, and voluntarily waived his right to present evidence of mitigation in his defense, as well as his right to an advisory jury recommendation. The penalty phase then proceeded as a bench trial.

During the penalty phase proceedings, the State offered evidence of statutory aggravating factors. The defense did not offer evidence of mitigating circumstances, but the trial court ordered a Pre-Sentence Investigation (PSI) to be prepared by the Florida Department of Corrections. After receiving the PSI, the trial court conducted a *Spencer*[2] hearing and received sentencing memoranda. On July 28, 2022, the trial court pronounced its sentence of death. In its sentencing order, the trial court gave great weight to two statutory aggravators: (1) that Roberts was previously convicted of

_____

2. *Spencer v. State*, 615 So. 2d 688 (Fla. 1993).

- 4 -

another capital felony, or of a felony involving the use or threat of violence to the person, and (2) that the capital felony at issue in the current case was especially heinous, atrocious, or cruel.

While Roberts had insisted that he did not want to present mitigating evidence, the court still found some mitigation. For statutory mitigators, the court gave some weight to Roberts' age but specifically found insufficient evidence to prove that Roberts was under the influence of extreme mental or emotional disturbance at the time of the murder, or that his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. As to nonstatutory mitigators, the trial court gave slight weight to Roberts' emotional disconnection from his father beginning in early childhood and little weight to his drug and alcohol usage throughout his life. The trial court gave some weight to his physical health and to his various mental health conditions including antisocial personality disorder. But the trial court found his educational background and intelligence to be not mitigating and his allegations of a brain injury as not established.

Roberts appealed his judgment and sentence of death, and we

received briefing and held oral argument. *Roberts v. State*, No. SC2022-1176, 2023 WL 8187322, at *1 (Fla. Nov. 27, 2023). In his initial brief, Roberts asserted that the "trial court violated his due process rights when it failed to conduct a competency hearing." *Id.* Upon consideration, we remanded for the trial court to determine, nunc pro tunc, Roberts' competency at the time of the trial. *Id.* We further instructed that "should the trial court determine that an evaluation of Roberts' competency at the time of the trial cannot be conducted in a manner that ensures Roberts' due process rights, then the trial court should proceed to adjudicate Roberts' current competency and, if he is competent, conduct a new trial." *Id.*

The circuit court conducted a competency hearing on September 6, 2024. Roberts was informed of the hearing and its purpose to which he responded unfavorably and refused to attend in person or virtually. The court determined that Roberts' refusal to attend the hearing was a voluntary, knowing, and intelligent waiver of his appearance, and the hearing proceeded.

Four witnesses[3] testified that Roberts was competent at the

_____

3. Dr. Prichard testified and is a forensic psychologist who participated in an earlier *Spencer* hearing to this case. Dr. Werner

time of trial.  The witnesses based their testimony on Roberts'

behavior in court, the sophistication of the documents he prepared

for the proceedings, psychological tests, and prior medical reports.

The witnesses also noted that Roberts had, by the time of trial,

successfully completed educational programs while in custody.  The

circuit court, after considering the witness testimony, concluded

that Roberts was competent at the time of trial.  Thereafter, we

received supplemental briefing regarding the sufficiency of the

hearing.

## II

On appeal, Roberts presents several claims of trial court error

spanning his guilt and penalty phases and during the nunc pro

tunc competency determination.  We address each in turn.

## A

Roberts first argues that the trial court erred during the guilt

---

is a forensic psychiatrist and testified with the same conclusions as
Dr. Prichard.  Dr. O'Neal testified as an expert and came to the
same conclusion as the other doctors after reading the transcripts
and records.  The Honorable G. Richard Singeltary testified as the
final witness at the nunc pro tunc hearing after presiding over the
pretrial motions, bench trial, *Spencer* hearing, and sentencing in
this case.

phase by admitting certain collateral crime, or *Williams* rule,[4] evidence of text messages and verbal threats. As codified in section 90.404(2)(a), Florida Statutes (2018), the general rule for the admission of collateral crime evidence is that "[s]imilar fact evidence of other crimes, wrongs, or acts is admissible when relevant to prove a material fact in issue, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." By contrast, collateral crime evidence is "inadmissible when the evidence is relevant solely to prove bad character or propensity" to commit the crime. *Kopsho v. State*, 84 So. 3d 204, 212 (Fla. 2012) (quoting § 90.404(2)(a), Fla Stat.). Even when admissible though, the State cannot make collateral crime evidence a feature of trial, which occurs "when inquiry into the collateral crimes 'transcends the bounds of relevancy to the charge being tried' and the prosecution 'devolves from development of facts pertinent to the main issue of guilt or innocence into an assault on the character of the defendant.' " *Conde v. State*, 860 So. 2d 930, 945 (Fla. 2003) (quoting *Williams v.*

---

4. *Williams v. State*, 110 So. 2d 654 (Fla. 1959).

*State*, 117 So. 2d 473, 475 (Fla. 1960)).

Here, as Roberts recognizes in his initial brief, trial counsel conceded that the evidence at issue was admissible collateral crime evidence but argued the evidence was so voluminous that it would become a feature of the trial. For this reason, to the extent Roberts argues the evidence did not qualify as collateral crime evidence, we reject his argument as unpreserved and inconsistent with trial counsel's concession. *See Scott v. State*, 331 So. 3d 297, 299 (Fla. 2d DCA 2021) ("[A] party may not ordinarily take one position in proceedings at the trial level and then take an inconsistent position on appeal." (alteration in original) (quoting *Harper ex rel. Daley v. Toler*, 884 So. 2d 1124, 1135 (Fla. 2d DCA 2004))), *disapproved on other grounds by Saffold v. State*, 429 So. 3d 424 (Fla. 2026); *see also Emmitt v. First Transit, Inc.*, 300 So. 3d 225, 229 (Fla. 4th DCA 2020) (holding that the defendant could not contend on appeal that a certain inconsistent statement should have been admissible as substantive evidence when he stipulated to the contrary below).

To the extent Roberts argues the collateral crime evidence became a feature of trial, we likewise reject his argument. The trial court correctly concluded that the evidence was introduced to

complete the story of the case, rather than to prejudice the trial court against Roberts. Evidence of his prior threats and acts of violence against Elizabeth was relevant to completing the narrative of their relationship. The admission of this evidence shed light on the controlling, aggressive, and violent nature of their relationship, as well as Roberts' state of mind at the time of her murder. Likewise, a review of the record establishes that the presentation of evidence did not devolve from a development of facts into an assault on Roberts' character. The trial court did not abuse its discretion in admitting the evidence.

**B**

In his next argument on appeal, Roberts argues that the trial court erred when it rejected the statutory mitigator of Roberts' capacity to conform his conduct to the requirements of the law. We review the trial court's determination for abuse of discretion. *Ault v. State*, 53 So. 3d 175, 186-87 (Fla. 2010).

Section 921.141(7), Florida Statutes, sets forth mitigating circumstances for the death penalty. At issue here is subsection (f): "[t]he capacity of the defendant to appreciate the criminality of his or her conduct or to conform his or her conduct to the requirements

of law was substantially impaired." We have explained that this provision protects "that person who, while legally answerable for his actions, may be deserving of some mitigation of sentence because of his mental state." *See Perri v. State*, 441 So. 2d 606, 608 (Fla. 1983) (quoting *State v. Dixon*, 283 So. 2d 1, 10 (Fla. 1973)).

In determining whether this factor or any mitigating factor is present, "[this Court's] sole concern on evidentiary matters is to determine whether there was sufficient competent evidence in the record from which the judge and jury could properly find the presence of appropriate aggravating or mitigating circumstances." *Brown v. Wainwright*, 392 So. 2d 1327, 1331 (Fla. 1981). And this specific factor has been explained as

> [m]ental disturbance which interferes with but does not obviate the defendant's knowledge of right and wrong . . . . Like subsection (b), this circumstance is provided to protect that person who, while legally answerable for his actions, may be deserving of some mitigation of sentence because of his mental state.

*Perri*, 441 So. 2d at 608 (internal citation omitted) (quoting *Dixon*, 283 So. 2d at 10).

Roberts' argument on this point rests primarily on his characterization of Dr. Prichard's "uncontested" testimony as

- 11 -

establishing Roberts' impairment in conforming his conduct to the requirements of the law.  But, in our view, Roberts overstates both the nature and import of Dr. Prichard's testimony.  Although Dr. Prichard acknowledged that no one except for Roberts was present when the alleged murder took place, and Roberts may have lost his temper, Dr. Prichard also testified that the inability to conform to the requirements of the law would indicate some mental illness, from which Roberts did not suffer.  Dr. Prichard testified that "Mr. Roberts had no mental health symptoms."

Equivocating as he did, Dr. Prichard's testimony did not conclusively establish the statutory mitigator by the greater weight of the evidence.  And after listening to testimony from both doctors, as well as observing evidence as to Roberts' actions after the murder, the trial court ascertained that any mental disturbance was not significant enough to fulfill the requirements of this statutory mitigator.  The trial court did not abuse its discretion doing so.  *See Ault*, 53 So. 3d at 188 (holding that, based on a review of the trial court's sentencing order, the trial court appeared to have considered all the evidence relating to two statutory mitigators and properly exercised its discretion in rejecting both

mitigators).

<h1 style="text-align:center">C</h1>

Roberts next argues that the trial court abused its discretion in overruling defense objections to the presentencing report and Dr. Prichard's testimony because both relied on "non-statutory aggravators."

Florida Rule of Criminal Procedure 3.710(b) provides that if a defendant in a capital case waives his right to present mitigation, the trial court must order a comprehensive PSI to determine the existence of mitigating circumstances. *See Amends. to Fla. Rules of Crim. Proc.*, 886 So. 2d 197, 199 (Fla. 2004). To be admissible during the penalty phase, the State's direct evidence needs to be related to a statutory aggravating factor. *Perry v. State*, 801 So. 2d 78, 90 (Fla. 2001). The State cannot present evidence of nonstatutory aggravating factors under pretense. *Id.* at 91. This is true for bench trials as well as jury trials; "[j]ust as a jury should not be exposed to evidence of impermissible aggravating factors, a judge should not be permitted to consider them as part of the evaluation process." *Oyola v. State*, 158 So. 3d 504, 510 (Fla. 2015). Even so, the State "shall be provided a full opportunity to

rebut the existence of mitigating factors urged by [the defendant] and to introduce evidence tending to diminish their weight if they cannot be rebutted." *Kormondy v. State*, 845 So. 2d 41, 51-52 (Fla. 2003) (quoting *Ellis v. State*, 622 So. 2d 991, 1001 (Fla. 1993)).

Here, the trial court's sentencing order demonstrates it properly considered both the PSI and Dr. Prichard's testimony. First, the trial court properly considered the arrests and nonviolent convictions listed in the PSI to rebut section 921.141(7)(a), Florida Statutes. Second, Dr. Prichard's testimony was specifically introduced and considered in order "to rebut some of the mitigation evidence presented in the PSI" and not to establish or to demonstrate nonstatutory aggravation by pretense. Indeed, the sentencing order references Dr. Prichard's findings and gives the testimony some weight only in the "mitigating circumstances" section. The trial court did not mention Dr. Prichard's findings as nonstatutory aggravation in the "aggravating circumstances" portion of its sentencing order, giving great weight only to the statutory aggravating factors. Accordingly, the trial court did not abuse its discretion in overruling defense objections to the PSI report and Dr. Prichard's testimony.

- 14 -

**D**

Roberts next challenges the constitutionality of the death penalty.[5] Roberts argues that the death penalty violates the Eighth and Fourteenth Amendments to the United States Constitution because: (1) it violates evolving standards of decency, (2) lethal injection categorically involves an unnecessary risk of pain as similarly foreclosed by precedent, and (3) it results in unreliable, arbitrary, and delayed penalties. We reject Roberts' constitutional attack as it is foreclosed by United States Supreme Court precedent. *See, e.g., Glossip v. Gross*, 576 U.S. 863, 869 (2015) ("[B]ecause it is settled that capital punishment is constitutional, '[i]t necessarily follows that there must be a [constitutional] means of carrying it out.'" (second and third alterations in original) (quoting *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 463-64 (1947))); *Baze v. Rees*, 553 U.S. 35, 47 (2008) (plurality opinion) ("We begin with the principle, settled by *Gregg* [*v. Georgia*, 428 U.S. 153 (1976)], that capital punishment is constitutional

_____

5. Robert's argument on this point appears to attack capital punishment generally as unconstitutional under the United States Constitution, rather than Florida's death penalty scheme specifically.

- 15 -

[and] [i]t necessarily follows that there must be a means of carrying it out." (citation omitted)).

## E

Roberts also challenges the constitutionality of Florida's capital sentencing scheme. Roberts argues that because Florida has eliminated comparative proportionality review and a heightened standard of review for cases involving wholly circumstantial evidence, the scheme fails to narrow the class of first-degree murderers who are eligible for death. But "[w]e have repeatedly rejected the argument that the death-penalty statute violates the Eighth Amendment because it fails to sufficiently narrow the class of murderers eligible for the death penalty." *Wells v. State*, 364 So. 3d 1005, 1015 (Fla. 2023). We likewise reject Roberts' argument on this point.

## F

Finally, through supplemental briefing received after the trial court's nunc pro tunc competency determination, Roberts argues the trial court erred in finding him competent to stand trial. He requests a new trial, claiming that the trial court could not conduct a sufficient nunc pro tunc evaluation. In support of his argument,

Roberts contends that the trial court considered medical records and trial transcripts from a trial over two years before, thus relying on "stale" medical records and a cold record, which requires reversal.

The United States Supreme Court has acknowledged the inherent difficulty in determining competency to stand trial retrospectively, even under the most favorable circumstances. *See Drope v. Missouri*, 420 U.S. 162, 183 (1975); *Pate v. Robinson*, 383 U.S. 375, 387 (1966). As a result, the Supreme Court has reversed convictions where it determined that a trial court could not make a retrospective competency determination that would adequately protect due process rights. *See, e.g., Drope*, 420 U.S. at 183 (where six years elapsed from the trial date to the release of the Supreme Court's decision); *see Pate*, 383 U.S. at 387 (where elapse of six years from time of trial was a significant factor in like determination). We have likewise acknowledged the difficulties retrospective competency determinations present. *See Mason v. State*, 489 So. 2d 734, 737 (Fla. 1986). Even so, we have been clear that there is no per se rule forbidding a nunc pro tunc competency evaluation. *Id.* Instead, such proceedings are appropriate if the

defendant can be assured due process of law. *Id.*

While we have been clear that nunc pro tunc competency evaluations are permitted, our precedent is less clear as to when such proceedings satisfy due process requirements. That said, in *Mason*, we cited *Martin v. Estelle*, 583 F.2d 1373 (5th Cir. 1978), and *United States v. Makris*, 398 F. Supp. 507 (S.D. Tex. 1975), as emblematic of satisfactory nunc pro tunc competency evaluations. Those cases both characterize a retrospective competency evaluation that comports with due process as a "meaningful" one— one where the "quantity and quality of available evidence is adequate to arrive at an assessment that could be labelled as more than mere speculation." *Martin*, 583 F.2d at 1374 (quoting *Bruce v. Estelle*, 536 F.2d 1051, 1057 (5th Cir. 1976)).

The factors that make a retrospective competency evaluation meaningful vary from case to case. But we have suggested the test may be satisfied when "there are a sufficient number of expert and lay witnesses who have examined or observed the defendant contemporaneous with trial available to offer pertinent evidence at a retrospective hearing." *Mason*, 489 So. 2d at 737 (quoting *Martin*, 583 F.2d at 1375); *see also Mason v. State*, 597 So. 2d 776, 778

(Fla. 1992).  "Likewise, the recollections of non-experts (including the observations of the trial judge) who had the opportunity to interact with defendant during the relevant period may in some instances provide a sufficient base upon which a factfinder may rest his decision that even a belated determination will be accurate." *United States v. Makris*, 535 F.2d 899, 905 (5th Cir. 1976).  These are just examples though.  Just as we have rejected per se rules forbidding nunc pro tunc competency determinations, we clarify that these examples should not be read as establishing bright line rules for the types of evidence that must be presented at competency hearings.  Instead, the meaningfulness test demands a case-by-case analysis.

With that framework in mind, we evaluate Roberts' argument that his hearing was inadequate because "stale" records cannot support a competency determination.  In support he relies primarily on *Losada v. State*, 260 So. 3d 1156 (Fla. 3d DCA 2018), and *Elder v. State*, 268 So. 3d 995 (Fla. 2d DCA 2019).  In *Losada*, after determining the trial court failed to make the requisite independent finding of competency, the court likewise determined that the facts of that case did not support a retroactive determination of the

defendant's competency to proceed. 260 So. 3d at 1163. In explanation, the Third District Court of Appeal noted that the trial court made its competency determination in December 2013, but the defendant did not go to trial until April 2016. The court also explained that none of the available experts examined or observed the defendant "contemporaneous with the trial" and therefore any competency hearing would not satisfy the "Florida Supreme Court's requirement." *Id.* Distinguishing the case from those where courts remanded for nunc pro tunc determinations, the Third District further observed that the trial court never received any explanation of the expert reports beyond defense counsel stating that they found the defendant competent and the defendant was not present at the competency hearing. *Id.* at 1164.

*Elder* turned primarily on the issue of the trial court exceeding the scope of the appellate court's mandate. 268 So. 3d at 999-1000. But the court later noted that even if its prior opinion had permitted a new hearing, the evidence was insufficient to support a finding of competency. *Id.* at 1000. Agreeing with the defendant, the Second District Court of Appeal noted that the trial judge determining retrospective competency had no personal experience

with the defendant at the time of the plea as he was not the presiding judge at that time. *Id.* at 1001. Thus, the trial judge's determination of retrospective competency was based entirely on his current perception of the defendant and on counsel's testimony. *Id.* The court characterized those facts as "exactly the situation that *Dougherty* [*v. State*, 149 So. 3d 672, 676 (Fla. 2014)] warned against: due process concerns resulting from the examination of a cold record and speculation." *Id.*

Neither *Losada, Elder,* nor the additional district court cases[6] cited by Roberts persuade us that the nunc pro tunc evaluation here was insufficient. In contrast to these cases, retired Judge George Singeltary testified that he presided over Roberts' trial, engaged in several colloquies with Roberts throughout the trial, and if asked to decide at that time, would have found him competent.

---

6. In *Auerbach v. State*, 273 So. 3d 134, 139 (Fla. 3d DCA 2019), "the only evidence available to the trial court in making a nunc pro tunc competency determination would be the doctors' reports issued three years before trial." In *Aquino v. State*, 290 So. 3d 525, 531 (Fla. 3d DCA 2019), the court merely remanded for the trial court to decide whether a nunc pro tunc proceeding satisfied due process. These cases present no conflict here because of the quantity and quality of contemporaneous evidence that provides for meaningful review.

In addition to Judge Singeltary's testimony, Dr. Prichard, the same expert who testified at Roberts' *Spencer* hearing, opined that there were sufficient data points with which to render an expert opinion on Roberts' competency at the time of trial. He recognized that Roberts had refused to see any mental health practitioner for a competency evaluation or any other reason. Even so, he reviewed documents created during the four years leading up to trial as well as hearing and trial transcripts and pro se pleadings. Dr. Prichard observed that Roberts obtained his GED while in custody, never took psychotropic mediations, and was assessed by mental health staff with a "normal mental health status" sixteen times between 2020 and 2022.

Dr. Prichard likewise highlighted Roberts' linear, logical, and rational pro se arguments and "very competent" pretrial pro se motions. He also noted the trial court's extensive colloquy with Roberts when Roberts waived mitigation during his penalty phase. As to Roberts' outbursts in court, Dr. Prichard characterized the behavior as a personality characteristic rather than indicative of incompetence. In the end, Dr. Prichard concluded that Roberts "clearly appreciated the charges and the penalties" as well as the

adversarial nature of the proceedings. This conclusion led to Dr. Prichard's ultimate opinion that Roberts was competent to proceed at the time of trial.

Two other experts, Dr. Tonia Werner and Dr. Steven O'Neal, were retained and testified. Both attempted a face-to-face evaluation, but Roberts refused. Even so, each expert was provided documents including the trial transcripts, pleadings, and psychiatric documents. Upon review, Dr. Werner found that Roberts did not exhibit any psychotic symptoms, disorganized thought process, or illogical thinking that was indicative that there was anything going on psychiatrically that would impair his ability to make decisions. Dr. Werner opined that Roberts' decision to waive mitigation was rational based on his stated reason of not wanting to put his family through the mitigation process. Dr. Werner ultimately opined that at the time of trial Roberts was competent to proceed.

Dr. O'Neal testified that there was nothing in the trial transcripts to suggest any significant mental illness or cognitive or perceptual problems. Dr. O'Neal opined that Roberts' lack of cooperation with counsel and the trial court was not an indication

of incompetence. He received questions as to each prong of the competency test and concluded Roberts was competent at the time of his trial.

Taking this all into account, we are convinced that the quantum and quantity of the evidence presented at the hearing was such that the circuit court's determination was not unduly speculative. The circuit court had the benefit of a lay witness who provided first-hand observations from the relevant period. In addition, three expert witnesses, one of whom was retained around the time of trial, provided their informed analyses of Roberts' competency at the time of trial. Competent, substantial evidence supports the trial court's determination. Roberts was therefore afforded due process. We affirm the trial court's nunc pro tunc competency determination.

## III

We affirm Roberts' conviction and sentence of death.

It is so ordered.

MUÑIZ, C.J., and LABARGA, COURIEL, GROSSHANS, FRANCIS, and SASSO, JJ., concur.
TANENBAUM, J., did not participate.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

An Appeal from the Circuit Court in and for Lake County,
    G. Richard Singletary, Judge
    Case No. 352017CF003368AXXXXX

Matthew J. Metz, Public Defender, Nancy Ryan, Assistant Public Defender, and George D.E. Burden, Assistant Public Defender, Seventh Judicial Circuit, Daytona Beach, Florida,

    for Appellant

James Uthmeier, Attorney General, Tallahassee, Florida, and Naomi Nichols, Assistant Attorney General, Daytona Beach, Florida,

    for Appellee